In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 07-4009 & 08-1085

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SAMI KOSHABA LATCHIN,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 661—**Rebecca R. Pallmeyer,** *Judge.*

ARGUED OCTOBER 28, 2008—DECIDED FEBRUARY 4, 2009

Before BAUER, RIPPLE, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* A jury found Sami Latchin, an Iraqi native who moved to the United States in the early 1990s, guilty of procuring citizenship illegally by making false statements in a naturalization application and of acting as an "unregistered agent" (a spy) for the Iraqi government. The case against Latchin was built on a treasure trove of Iraqi government materials seized by the FBI in Baghdad in 2003 after the fall of Saddam

Hussein. After his convictions, Latchin's citizenship was revoked. On this appeal, he asks us to vacate his convictions for want of sufficient evidence and error in the jury instructions. Because the government supposedly failed to prove that he was ineligible for citizenship, Latchin asks us to undo the revocation order as well. We begin with the facts viewed in the light most favorable to the verdict.

The government alleged that Saddam Hussein, anxious to recover from his defeat in the First Gulf War, established an ambitious spy program. The plan: install "sleeper" agents in countries around the world; have them spend the next few years earning the trust of their communities; and then, when they had gained positions of influence, activate them to gather intelligence and influence policy in favor of Saddam's Ba'athist regime. All spy programs, of course, operate on deception—the spies pretend to be people they aren't. But Saddam's plan took it to a whole new level—not even the spies would know they were part of the program until they were activated many years down the road.

Latchin was selected as one of the sleeper agents and given the dubious honor of being the only spy planted in the United States. He was a natural choice. Latchin joined the Iraqi Intelligence Service (IIS) in 1979, so he had years of experience under his belt. More importantly, though, he was uniquely positioned to facilitate the IIS's chief mission in the United States—to gather intelligence on Iraqi opposition groups. As a member of the minority Christian community in Iraq, Latchin would

have the inside track to befriending Iraqi Christians in the United States, individuals Saddam thought were hostile to his regime. And Latchin had experience spying on these people. In the 1980s, he posed as an Iraqi Airways employee in Athens, gathering information on Iraqi Christians entering the United States by way of Greece.

As we said, though, participants in the sleeper program, including Latchin, had no idea they were part of this particular program. So when Latchin moved to the United States in 1993, he was unaware that he had been chosen as a sleeper agent. But that doesn't mean Latchin thought he was out of the spy business altogether. An IIS agent testifying under the pseudonym "Ali" said that he approached Latchin while Latchin was still in Iraq and informed him that the IIS approved his relocation to the United States. Ali did not give Latchin "any details about the plan," but Latchin must have known there would be work to do. The agent told Latchin "not to do anything whatsoever, just get [to the United States] and settle until I give you further details about the plan later." It is unclear whether those "details" ever came or whether Latchin took any covert action once he arrived in the United States. What we do know is that, after he moved here, Latchin traveled to Eastern Europe on several occasions between 1994 and 1997 to meet with Ali, who was then acting as Latchin's "handler." As a handler, Ali was essentially a liaison between Latchin and the IIS: he gave Latchin a codename; devised a cover story in case Latchin ever ran into trouble with the authorities; and filed reports with the IIS following meetings with Latchin.

But the most salient action taken by Ali was compensating Latchin for his services, payments that totaled approximately $24,000 per year.[1] To counter this evidence, Latchin argued that he simply thought it was his retirement pay. Latchin presented evidence that he had retired from the IIS and moved to America with the agency's blessing (but nothing more).

In any event, Latchin settled down in 1993 with his family in Chicago and acquired a job as a counter agent at O'Hare International Airport. After residing in the United States for five years, Latchin successfully applied for naturalization in 1998. That may strike the reader as a shock. How could a spy for Saddam Hussein—whether past or present—acquire citizenship so easily? According to the government, only by lying.

The application form asked three critical questions. First, it asked Latchin to "[l]ist [his] employers during the last five (5) years." Latchin reported his work at O'Hare but said nothing of the IIS or any other involvement with the Iraqi government. He maintained his silence when he arrived at the second question. That question asked him to "[l]ist [his] present and past membership in or affiliation with every organization, association, fund, foundation, party, club, society, or similar group in the United States or any other place," including "military service." Latchin wrote "none." Finally, the application inquired whether

---

[1] The government also introduced evidence that Latchin had other handlers and received other payments after Ali retired in 1998.

Latchin had been "absent from the U.S. since becoming a permanent resident." Latchin admitted that he had traveled outside the country on a number of occasions but said he merely went on "vacation."

After Latchin completed the naturalization form, he met with Emily Reyes of the Immigration and Naturalization Service (INS) for a live interview. Reyes quizzed Latchin on his command of the English language and knowledge of United States history and government. She also reviewed the naturalization form and asked Latchin to confirm his answers, which he did without exception. With no inkling of Latchin's connections to the IIS, Reyes approved the application "on the spot." Had Latchin disclosed his affiliation with the IIS, however, Reyes testified she would have investigated further and passed the matter along to her supervisor.

With this evidence in place, the jury was asked to decide whether Latchin (1) procured citizenship illegally by making false statements in violation of 18 U.S.C. § 1425(a), and (2) acted as an unregistered foreign agent in violation of 18 U.S.C. § 951(a).[2] The jury answered "yes" on both counts, and now we must decide whether that verdict was supported by sufficient evidence. In addition, we must decide whether the trial court committed reversible error in instructing the jury on the requirements of § 1425(a) and, if the conviction stands after all that, whether the court erred in revoking Latchin's citizenship.

---

[2] Latchin was also convicted of three other counts, but those are not before us on appeal.

When a defendant disputes the sufficiency of the evidence, we "must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Haddad*, 462 F.3d 783, 791 (7th Cir. 2006) (internal quotation marks omitted). We start with Latchin's conviction under § 1425(a).

Section 1425(a) makes it a crime to "knowingly procure[ ]" or "attempt[ ] to procure" naturalization in contravention of the law. 18 U.S.C. § 1425(a). One of the ways a person can procure citizenship illegally, the way charged in this case, is to make false statements in a naturalization application. 18 U.S.C. § 1001(a). However, though the elements of the crime of procuring citizenship through false statements would seem clear enough, we have never ventured to define them. Both sides agree that a false statement has to be "material" to sustain a conviction—a trivial falsehood will not do—but they cross swords over what that word means and what else might be necessary. The government advocates for a definition of materiality that is consistent with general legal usage: a misrepresentation is material if it influenced the naturalization decision, regardless of whether it was outcome-determinative. Latchin would increase the government's burden so that a false statement is only material if a true statement would have precluded citizenship. Since no one testified that Latchin's application would have been outright *denied* had he disclosed his affiliation with the IIS—Reyes only said she would have asked more questions and flagged the case for a supervisor—Latchin

submits that the government failed to prove its case. We disagree.

The pivotal decision in all this is *Kungys v. United States*, 485 U.S. 759 (1988). *Kungys* holds that a statement in an application for citizenship is material if it has a "natural tendency to influence" the naturalization decision. *Id.* at 771. The Court eschewed any strict formula hinging on probabilities, observing that it "has never been the test of materiality that the misrepresentation or concealment would *more likely than not* have produced an erroneous decision, or even that it would *more likely than not* have triggered an investigation." *Id.* Instead, a statement is material as long as it is germane to the decisional process, as long as it has a "natural tendency to influence" a reviewing officer's actions.

It is tempting to end the analysis there (and hold Latchin's § 1425(a) conviction sufficient because it passes the *Kungys* test for materiality), but that would be a mistake. We must also consider *Kungys*'s discussion of what must be proven beyond materiality to establish that citizenship was *procured* through misrepresentation.[3]

*Kungys* is not a clean opinion. It is maddeningly fractured. Here is how the Supreme Court Reporter explained who was on what side:

---

[3] We acknowledge that *Kungys* dealt with a different statute, a civil statute, 8 U.S.C. § 1451(a). However, the parties suggest that distinction is trivial, and we agree; the civil and criminal statutes both require a material misrepresentation and procurement of citizenship.

Scalia, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II-A, and III-A, in which Rehnquist, C.J., and Brennan, White, and O'Connor, JJ., joined, and an opinion with respect to Parts II-B and III-B, in which Rehnquist, C.J., and Brennan and (as to Part III-B only) O'Connor, JJ., joined. Brennan, J., filed a concurring opinion, *post*, p. 783. Stevens, J., filed an opinion concurring in the judgment, in which Marshall and Blackmun, JJ., joined, *post*, p. 784. O'Connor, J., filed an opinion concurring in part and dissenting in part, *post*, p. 801. White, J., filed a dissenting opinion, *post*, p. 801. Kennedy, J., took no part in the consideration or decision of the case.

The *Kungys* majority held that there are "four independent requirements" to the offense of procuring citizenship by misrepresentation: "the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment." *Kungys*, 485 U.S. at 767. So a majority of the Justices agreed that "materiality" and "procurement" are separate elements, and satisfaction of one does not necessarily mean satisfaction of the other. A majority also agreed that, at a minimum, the procurement requirement "demands . . . that citizenship be obtained as a result of the application process in which the misrepresentations or concealments were made." *Id.* at 776. The Court split, however, over what else procurement means. Justice Stevens, speaking for two others, advocated

what amounts to a "but for" test—that the government has to establish that citizenship would not have been conferred but for the misrepresentation. Justice Scalia, joined by two others, rejected this construction because it would make the materiality requirement meaningless, "requiring, in addition to distortion of the decision [(procurement)], a natural tendency to distort the decision [(materiality)]." *Id.* at 776. But Justice Scalia and company did agree that procurement requires more than just obtaining citizenship "as a result of the application process in which the misrepresentations or concealments were made." To them, proof of a material misrepresentation created a presumption that citizenship was procured on that basis. However, the citizen could rebut that presumption by showing that she was actually eligible for citizenship. Justice Brennan wrote a separate concurrence joining in Justice Scalia's opinion to make a controlling plurality. Justice Brennan's controlling opinion stressed that citizenship is a "most precious right" and added a more restrictive gloss to Justice Scalia's view. *Id.* at 783 (Brennan, J., concurring). Although Justice Brennan agreed that a material falsehood can raise a presumption of ineligibility, he said that presumption does not arise unless the government produces evidence sufficient to raise a "fair inference of ineligibility." *Id.* at 783 (Brennan, J., concurring). At the end of the day, then, the government only wins if it shows that the citizen misrepresented a material fact *and* it is "fair to infer that the

citizen was actually ineligible."[4] *Id.* at 784 (Brennan J., concurring).

So, did the government in this case prove as much beyond a reasonable doubt? Absolutely. It established a material misrepresentation with Reyes's testimony that, had Latchin been forthcoming about his affiliation with the IIS, she would have investigated the matter further and passed it along to a supervisor. It matters not that there is no firm evidence showing Latchin's application would have been denied absent his lie; Latchin's misrepresentation had a "natural tendency to influence" the naturalization decision, and that is all that is required. *Kungys*, 485 U.S. at 771. And there can be no question that it *was* a misrepresentation. Even if Latchin was not technically "employed" with the IIS when he applied for citizenship, he still had an obligation to disclose his past affiliation with that agency, and a reasonable jury could find that he failed to do so with the intent to deceive.

As for procurement, the government established this element because it was "fair to infer that [Latchin] was

---

[4] This reading of *Kungys* is consistent with our own precedent, *see Kalejs v. INS*, 10 F.3d 441, 446 (7th Cir. 1993) (applying *Kungys* in the civil deportation context), as well as with every federal appellate decision applying *Kungys* to a prosecution under 18 U.S.C. § 1425(a). *United States v. Alferahin*, 433 F.3d 1148, 1155 (9th Cir. 2006); *United States v. Puerta*, 982 F.2d 1297, 1301 (9th Cir. 1992); *United States v. Aladekoba*, 61 Fed. Appx. 27, 28 (4th Cir. Mar. 17, 2003); *United States v. Agyemang*, 230 F.3d 1354, *1 (4th Cir. Sept. 15, 2000); *United States v. Agunbiade*, 172 F.3d 864, *2-3 (4th Cir. Jan. 25, 1999).

actually ineligible." *Id.* at 784 (Brennan, J., concurring). It defies common sense to think that the INS would have naturalized a man who worked for years as a spy for a hostile regime and who had at least some ongoing relationship with the IIS. Even so, the government did not have to prove ineligibility; by establishing a "fair inference of ineligibility," the burden shifted to Latchin to prove that he was in fact eligible. Latchin failed to carry that burden.

Before leaving § 1425(a) for good, we must decide whether, despite sufficient evidence, the conviction should be reversed for faulty jury instructions. We review jury instructions *de novo* but "reverse only if the instructions, viewed as a whole, misguide the jury to the litigant's prejudice." *United States v. Thornton*, 539 F.3d 741, 745 (7th Cir. 2008).

We have explained that a conviction under § 1425(a) requires proof of both materiality and procurement, as defined by *Kungys*. We are not alone in this view. *See, e.g.*, *United States v. Alferahin*, 433 F.3d 1148, 1155 (9th Cir. 2006). With this in mind, we have little trouble approving the trial court's instructions in this case. Although the court could have laid out the elements with more precision, it covered all the bases. The court told the jury that it had to find the following elements beyond a reasonable doubt:

> First, that the defendant while under oath testified falsely before an officer of the Immigration and Naturalization Service as charged in the indictment.

> Second, that the defendant's testimony related to some material matter.

And third, that the defendant knew the testimony was false.

At first blush that seems incomplete—where's the procurement requirement? Further examination shows, however, that the court included that element within its explanation of materiality:

A false statement is material under Section 1425(a) if (1) the production of truthful information would have led to the discovery of facts relevant to the applicant's petition for naturalization, and (2) the production of that evidence would raise a fair inference that the defendant was statutorily ineligible for naturalization.

In future cases, we advise district courts to treat procurement as a separate element rather than a concept subsumed within the definition of materiality. Nonetheless, the superficial error in this case did not harm Latchin. If anything, in fact, the instructions made it more difficult for the government. Latchin's conviction under § 1425(a) is sound.

So is his conviction for acting as an unregistered foreign agent in violation of 18 U.S.C. § 951(a). That statute makes it a crime to "act[ ] in the United States as an agent of a foreign government without prior notification to the Attorney General . . . ." An "agent of a foreign government" is defined as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official . . . ." 18 U.S.C. § 951(d). The parties agree that the statute requires more than mere status as a foreign agent; it re-

quires *acts* as an agent on behalf of a foreign country. Our decision in *United States v. Dumeisi*, 424 F.3d 566, 581 (7th Cir. 2005), another case involving the IIS, suggests that this concession is well-taken. Latchin's argument that the proof was lacking in this department, on the other hand, is just plain wrong. There may not have been direct evidence of acts on behalf of Iraq, but the circumstantial evidence was strong. In addition to receiving sums of money from IIS personnel at international locations, Latchin placed 39 phone calls to IIS agent "Khalil"—second in command of the sleeper program—in Baghdad between June 2001 and May 2004. It's hard to believe that Latchin was just calling to chat, or that this was all done in connection with his IIS "pension plan." Whether Latchin actually spied on Iraqi Christians in the United States may be another matter altogether. But the jury did not have to find that he did to convict him under § 951. It was enough for the jury to conclude that Latchin took acts of *some kind* on behalf of Iraq without first registering as a foreign agent. The evidence was more than sufficient to meet that end.

Affirming these convictions makes Latchin's final argument—that the court erred in revoking his citizenship—little more than academic, but we address it nevertheless. Latchin contends that revoking his citizenship under the circumstances of this case amounts to a denial of due process. This argument is at war with statutory law and common sense. Under 8 U.S.C. § 1451(e), a conviction for knowingly procuring naturalization in violation of the law results in automatic denaturalization. The district court's revocation order was therefore

plainly proper—in fact required—according to the immigration code. Yet, Latchin submits that this result is unjust because the jury instructions pertaining to the unlawful procurement count "allowed conviction on the basis of findings that would be insufficient to support a civil order of denaturalization." No, they did not. As we explained, *Kungys* set forth the elements necessary to denaturalize a citizen under 8 U.S.C. § 1451(a); those elements, particularly the materiality and procurement elements, translate over to 18 U.S.C. § 1425(a); the jury was instructed on those elements; it found each of those elements satisfied; and its verdict was supported by sufficient evidence. Revoking citizenship under these circumstances is consistent with due process.

Accordingly, the judgment of conviction and order of denaturalization are AFFIRMED.