RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0051p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 15-1331

RASMIEH YOUSEF ODEH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cr-20772—Gershwin A. Drain, District Judge.

Argued: October 14, 2015

Decided and Filed: February 25, 2016

Before: BATCHELDER, MOORE, and ROGERS, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Michael E. Deutsch, PEOPLE'S LAW OFFICE, Chicago, Illinois, for Appellant. Jonathan Tukel, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Michael E. Deutsch, PEOPLE'S LAW OFFICE, Chicago, Illinois, for Appellant. Jonathan Tukel, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. Katherine M. Gallagher, CENTER FOR CONSTITUTIONAL RIGHTS, New York, New York, for Amicus Curiae.

ROGERS, J., delivered the opinion of the court and an opinion in Part II.b, in which MOORE, J., joined in part and in the judgment in part, and BATCHELDER, J., joined in part. MOORE, J. (pp. 19–20), delivered a separate opinion concurring in part and in the judgment in part. BATCHELDER, J. (pp. 21–24), delivered a separate opinion concurring in part and dissenting in part.

1

---

**OPINION**

---

ROGERS, Circuit Judge. Rasmieh Odeh appeals the judgment entering her conviction and sentence for violating 18 U.S.C. § 1425(a), which criminalizes knowingly procuring naturalization contrary to law. Odeh was convicted by a jury in November 2014 for making false statements in her naturalization application and to an immigration officer. The prosecution was based on Odeh's statements, among others, that she had never been arrested, convicted, or imprisoned, even though she was arrested, convicted, and imprisoned in Israel in 1969–1970 for her role in the bombing of a supermarket and an attempted bombing of the British Consulate.

On appeal, Odeh's primary argument is that she was denied the right to present a complete defense because the district court precluded her witness, an expert in post-traumatic stress disorder (PTSD), from testifying about why Odeh did not know that her statements were false. Odeh maintains that the expert would have testified that Odeh's alleged torture in an Israeli prison gave her PTSD, which shaped the way that she viewed questions about her criminal history in the naturalization application. Because this type of testimony is not categorically inadmissible to negate a defendant's knowledge of the falsity of a statement, the district court must reconsider the admissibility of the testimony. Odeh's remaining objections to other evidentiary rulings and the reasonableness of her sentence are without merit.

In October 2013, Odeh was charged in a single-count indictment with violating 18 U.S.C. § 1425(a), the criminal denaturalization statute. Section 1425(a) provides that "[w]hoever knowingly procures or attempts to procure, contrary to law, the naturalization of any person" shall be fined or imprisoned. The indictment alleges that Odeh "procured her citizenship despite her criminal history and despite her having made . . . material false statements" related to her criminal history and to the truth of the statements in her immigrant visa application. The elements of the § 1425(a) violation, according to the district court's jury instruction, were that (1) Odeh was naturalized, (2) Odeh made a false statement in her naturalization application or during her naturalization interview, (3) Odeh knew the falsity of the statement, (4) the statement was material, and (5) Odeh procured citizenship as a result of the false statement, meaning that

without the statement, her application would have been denied.[1]  After a jury convicted Odeh, the district court revoked Odeh's citizenship, as is required by 8 U.S.C. § 1451(e), and sentenced her to eighteen months' imprisonment.

The Government's case was based on false statements that Odeh made in her naturalization application, to a federal immigration officer who interviewed Odeh after she submitted her naturalization application, and in her application for an immigrant visa.  Odeh does not dispute that her statements were false.  Odeh's immigration history and criminal history before moving to the United States are briefly described as follows.

In 1994, Odeh submitted an immigrant visa application to the United States State Department in Amman, Jordan.  On the application, Odeh stated that she had continuously lived in Amman since 1948.  Odeh also answered "No" in response to the questions of whether she had "ever been arrested, convicted, or ever been in a prison," whether she had been convicted of "a crime involving moral turpitude," and whether she had been "convicted of 2 or more offenses for which the aggregate sentences were 5 years or more."  These answers were false.  Odeh lived in both Israel and Lebanon before moving to Jordan in 1983.  In 1969 and 1970, Odeh was arrested in Israel, charged by a military indictment, and convicted on several charges by a military court for her role in a bombing in a supermarket that killed two civilians and wounded others, and for her role in an attempted bombing of the British Consulate.  One of Odeh's convictions related to her membership in the Popular Front for the Liberation of Palestine, which was designated a "foreign terrorist organization" by the United States Secretary of State in 1997.  Odeh received two life sentences and served ten years in prison before being released in 1979 in a prisoner exchange.  The State Department did not discover any of the false statements and granted Odeh's visa.

Following the visa approval, Odeh lived in the United States for approximately ten years before applying for citizenship in 2004.  On the naturalization application, questions related to criminal history began with the phrase "Have you **EVER**".  The word "ever" was capitalized and

---

[1]Although these five elements are not apparent from the text of § 1425(a), Odeh has not challenged that these elements are required for proving a § 1425(a) violation.  However, she adds that there is also a sixth element—that her purpose in lying was to act unlawfully.  As discussed in Part I below, we need not address this argument to conclude that the case must be remanded.

in bold in each question.  As an example, one question asked: "Have you **EVER** been charged with committing any crime or offense?"  Other questions in the same format asked about prior arrests, convictions, and prison sentences.  Odeh falsely answered "No" to each of these questions.  Odeh also falsely answered "No" in response to questions asking whether she had "**EVER** given false or misleading information to any U.S. government official while applying for any immigration benefit" and whether she had "**EVER** lied to any U.S. immigration official to gain entry or admission into the United States."

After submitting the application, Odeh was interviewed by an immigration officer with the Department of Homeland Security, Jennifer Williams.  Williams verbally repeated each question on Odeh's application and confirmed that Odeh's original answers were correct.  Williams testified at trial that pursuant to her department's policy, in every interview, she added the phrase "anywhere in the world" at the end of every criminal history question.  Williams thus testified that instead of asking, for example, whether Odeh had ever been charged with committing any crime, she asked whether Odeh had ever been charged with committing any crime anywhere in the world.  Odeh did not change any of her answers related to her criminal history.  Her naturalization application was approved and she worked as a community organizer with the Arab-American Action Network for the next ten years, providing services for immigrant women.  At trial, a Government witness testified that if Odeh had been truthful on her application or in her interview, she would have been ineligible for citizenship due to false statements on her immigrant visa application and a statutory bar prohibiting entry to anyone who has engaged in a "terrorist activity."[2]  *See* 8 U.S.C. § 1101(f)(6) (providing that any person "who has given false testimony for the purpose of obtaining any [immigration] benefits" is not of good moral character); § 1182(a)(3)(B)(i)(I) (rendering ineligible for admission foreigners who "ha[ve] engaged in a terrorist activity"); § 1182(a)(3)(B)(iii)(V) (defining terrorist activity).

At trial, the Government introduced Israeli documents from 1969–1975 related to Odeh's arrest, indictment, convictions, and sentence.  The Government used the documents to prove the

---

[2]The district court prohibited the Government from using the words "terrorist activity," a term in the federal statute, on the basis that this would be unduly prejudicial.  The Government's witness accordingly testified that Odeh would be ineligible for naturalization due to the bombing conviction, but did not use the term "terrorist activity."

falsity and materiality of Odeh's statements, her knowledge of their falsity, and that she procured citizenship because of the statements. These documents were admitted under a mutual legal assistance treaty between the United States and Israel. *See* Treaty Between the Government of the United States of America and the Government of the State of Israel on Mutual Assistance in Criminal Matters, U.S.-Isr., Jan. 26, 1998, T.I.A.S. No. 12925 [hereinafter MLAT]. The MLAT provides, in pertinent part, that a requesting state may request "copies of any documents, records, or information which are in the possession of a government department or agency of th[e requested] State but which are not publicly available." *Id.* art. IX, ¶ 2. The MLAT also provides that where there is an appropriate authentication by the requested state, "[n]o further authentication or certification shall be necessary in order for such records to be admissible" in United States court proceedings. *Id.*

In pretrial motions, Odeh opposed admitting the Israeli documents on the basis that the Israeli military court system "does not operate in accordance with fundamental fairness, due process or international law," because, she alleged, the Israeli presence in the West Bank in 1969 was illegal and the Israeli military systematically tortured Palestinians. Odeh asserted that her confession to the bombing was the result of severe torture by the Israeli military for over twenty-five days, including beatings, electric shocks, and rape. Odeh also asked the district court to order the Government to stipulate that Odeh had been convicted and imprisoned for a "serious offense," in lieu of admitting the Israeli documents. In the alternative, Odeh asked the court to redact language in the Israeli indictment related to the details of the charges. The court admitted the documents over Odeh's objections, reasoning that the fairness of the Israeli court system was irrelevant, the documents were not unduly prejudicial, and the Government was entitled to prove the elements of the offense without accepting a stipulation.

Besides the evidentiary objections, Odeh also argued that § 1425(a) is a specific intent crime and that the Government must therefore prove that Odeh had a "bad purpose" in providing false answers. Characterizing the crime as a specific intent crime was said to be important to Odeh's defense, which was that when reading the questions on the naturalization application and hearing the questions from Williams, she believed that the questions referred only to her time in the United States. In support of this theory, Odeh intended to call as a witness Dr. Mary Fabri, a

clinical psychologist who specializes in the treatment of torture survivors. Dr. Fabri purportedly would have testified that Odeh's torture gave her chronic PTSD and that this disorder operated to automatically filter out Odeh's time in Israel, causing Odeh to interpret questions so as to avoid any thought of her trauma. Dr. Fabri would have thus testified that Odeh employed a protective mechanism that narrowed her focus in reading and hearing the criminal history questions. The district court initially ruled that § 1425(a) is a specific intent crime and that Dr. Fabri's testimony was therefore potentially admissible—after an evidentiary hearing—as to Odeh's mens rea. Upon reexamination of the issue, however, the court reversed itself, holding that § 1425(a) is a general intent crime. The court concluded:

> [T]he Court must reconsider its earlier decision and now holds that § 1425 is not a specific intent crime. The Government must therefore only establish that Defendant made a false statement on her Naturalization Application knowing it to be a false statement. In light of the Court's decision concerning the *mens rea* required for proving a violation of § 1425, the Court must deny Defendant's Motion for Offer of Proof, which seeks to admit the testimony of a clinical psychologist concerning her conclusions with respect to Defendant's defense related to post-traumatic stress disorder. It is well settled that this type of defense is inadmissible to negate the *mens rea* of a general intent crime, thus the expert's testimony is irrelevant to the issues herein and inadmissible at trial. *United States v. Kimes*, 246 F.3d 800, 806 (6th Cir. 2001); *United States v. Gonyea*, 140 F.3d 649, 651 (6th Cir. 1998).

Similarly, the court barred Odeh from testifying about her torture and PTSD.

Odeh appeals the district court's judgment, challenging primarily the court's exclusion of Dr. Fabri's testimony. Odeh makes two related arguments for the testimony's admissibility. First, she argues that the testimony is potentially admissible because § 1425(a) is a specific intent crime. Second, she argues that even if the statute is a general intent crime, the district court should have nonetheless allowed her to introduce evidence suggesting that she did not know that her statements were false.

**I.**

Regardless of whether 18 U.S.C. § 1425(a) is a specific or general intent crime, Dr. Fabri's proffered testimony is relevant to whether Odeh knew that her statements were false. The district court accordingly erred in categorically excluding this testimony. Section 1425(a)

provides that "[w]hoever knowingly procures or attempts to procure, contrary to law, the naturalization of any person" shall be fined or imprisoned. To satisfy § 1425(a)'s mens rea requirement, the parties agree that the Government must prove at least that Odeh knew that one of her statements was false. They also agree that if this is all that the Government must prove, § 1425(a) is a general intent crime.[3] The parties contest whether the Government must also prove why Odeh made the false statements; that is, whether Odeh had a "bad purpose"—the key feature of specific intent crimes—to commit the unlawful act of procuring citizenship by lying. The Government maintains that this specific/general intent distinction determines whether Dr. Fabri's testimony is admissible. We need not decide, however, whether § 1425(a) is a general or specific intent crime to conclude that Dr. Fabri's testimony is not categorically barred by our decisions in *Kimes*, 246 F.3d 800, and *Gonyea*, 140 F.3d 649.[4] The rule that the Government derives from those decisions does not apply in this case.

Dr. Fabri's testimony is potentially admissible because it is relevant to whether Odeh knew that her statements were false, which is an element of a § 1425(a) prosecution. Because the Government must prove every element of a crime beyond a reasonable doubt, *see In re Winship*, 397 U.S. 358, 363–64 (1970), a defendant's right to present a defense "generally includes the right to the admission of competent, reliable, exculpatory evidence" to negate an element of the offense, *see United States v. Pohlot*, 827 F.2d 889, 900–01 (3d Cir. 1987) (citations omitted). Thus, in *Chambers v. Mississippi*, the Supreme Court held that the defendant should have been allowed to present testimony implicating another individual in the crime,

---

[3]A general intent crime requires only that a defendant "intend to do the act that the law proscribes." *Gonyea*, 140 F.3d at 653 (citation and internal quotation marks omitted). A specific intent crime, by contrast, requires that a defendant act with the additional "purpose of violating the law." *See id.* (citation omitted). This purpose element requires the defendant to know that his conduct is unlawful, but does not require the defendant to know the specific law that he is violating. *See United States v. Chowdhury*, 169 F.3d 402, 406–07 (6th Cir. 1999).

[4]Deciding this case on a ground other than whether § 1425(a) is a general or specific intent crime avoids several questions raised by the language of this statute. Section 1425(a) uses the word "knowingly," a word used by many general intent statutes, but the requirement that a defendant's statement be "contrary to law" suggests that § 1425(a) incorporates other naturalization provisions, which may require different mental states. Most courts that have addressed the issue have concluded that § 1425(a) incorporates other immigration provisions. *See United States v. Aquino*, No. 1:07 CR 428, 2008 WL 302363, at *3 (N.D. Ohio Feb. 1, 2008) (collecting cases); *see also United States v. Damrah*, 412 F.3d 618, 623 (6th Cir. 2005). Some of these potential predicate offenses use language suggesting a specific intent crime, *see* 18 U.S.C. § 1001(a); others use language suggesting a general intent crime, *see* 18 U.S.C. § 1015(a); and still others do not refer to a mental state at all, but instead determine who is eligible to receive immigration benefits, *see* 8 U.S.C. § 1182(a)(2)–(3). The analysis in the text obviates the need to decide whether to label § 1425(a) a specific or general intent crime in the context of this case.

because that testimony "bore persuasive assurances of trustworthiness" and "was critical to [the defendant's] defense." 410 U.S. 284, 302 (1973). The right to present a complete defense is therefore subject only to "reasonable restrictions" that "are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). In this case, Dr. Fabri's testimony is potentially exculpatory because it undermines an element of the crime. The district court, however, did not rule on the competence or reliability of this testimony. Indeed, the district court did not tie the exclusion of evidence to a reasonable evidentiary restriction, but to a supposed categorical rule that does not apply. That ruling does not provide a sufficient basis for disallowing Odeh from presenting testimony that negates an element of § 1425(a).

The Government argues that Dr. Fabri's testimony was inadmissible based on our statement in *Kimes* and *Gonyea* that "diminished capacity may be used only to negate the mens rea of a *specific intent* crime." *Kimes*, 246 F.3d at 806 (quoting *Gonyea*, 140 F.3d at 650) (internal quotation marks omitted). The first step in the Government's argument involves characterizing § 1425(a) as a general intent crime by relying on *United States v. S & Vee Cartage Co.*, 704 F.2d 914 (6th Cir. 1983). In that case, we held that a statute criminalizing the making of a false statement related to employee pension funds, while knowing that the statement was false, is a general intent crime. *Id.* at 918–19. Under the Government's reasoning, because § 1425(a) is a general intent crime by analogy to *S & Vee Cartage*, the statute falls squarely within the ambit of the statement in *Kimes* and *Gonyea* that diminished capacity evidence is admissible only in specific intent prosecutions.

Even assuming that § 1425(a) is a general intent crime, the Government's reliance on *Kimes* and *Gonyea* is misplaced because those decisions are distinguishable. The holdings in those cases are based on the fact that the evidence the defendants sought to introduce negated *only* a potential specific intent element, the defendants' purpose in committing the crime. The purported rule could therefore be rephrased to state that "evidence of diminished capacity is inadmissible in general intent prosecutions where the diminished capacity relates to what would be a specific intent element." Because *Kimes* and *Gonyea* are distinguishable, the Government's argument that the law-of-the-circuit doctrine prevents this court from granting relief fails.

In *Gonyea*, the defendant attempted to introduce psychological evidence that he was unable to resist committing the bank robberies for which he was charged. 140 F.3d at 650. The trial court precluded the defendant from offering this testimony. *Id.* In his brief on appeal, the defendant argued that bank robbery under 18 U.S.C. § 2113(a) is a specific intent crime and that the psychological evidence showed that he did not specifically intend to commit an unlawful act. Final Brief of Defendant-Appellant Jerry Gonyea at 23, 26, *Gonyea*, 140 F.3d 649 (No. 96-2267). We held that the defendant's evidence was not admissible, concluding that § 2113(a) is a general intent crime. *Gonyea*, 140 F.3d at 654. Although we did not spell out the reasoning for our holding beyond stating that bank robbery is a general intent crime, it is apparent that we rejected the defendant's argument because his alleged inability to resist committing the crime did not negate the general intent requirement that a defendant must know that he is doing the act that makes up the crime. Indeed, the psychological evidence showed that "[t]he defendant felt compelled to continue to act on his obsessive goal of robbing the bank," a fact that would tend to prove only that the defendant did not have a bad purpose. *Id.* at 650.

A similar set of facts arose in *Kimes*, a case involving an assault of a federal officer. 246 F.3d at 802–03. In *Kimes*, the defendant sought to introduce evidence that PTSD "robbed him of the ability to control his actions," such that when a federal officer touched his shoulder, he could not help but overreact. *Id.* at 803. In rejecting this claim, we held that the assault of a federal officer under 18 U.S.C. § 111(a)(1) is a general intent crime because it is "sufficient for a defendant to act, regardless of the reason for the action." *Kimes*, 246 F.3d at 808. Because the Government did not have to prove that the defendant specifically intended harm and the defendant's evidence was relevant only to his purpose in assaulting the officer, that evidence was properly excluded. *Id.* at 808–09. In *United States v. Willis*, too, we similarly held inadmissible evidence of paranoid personality disorder in a prosecution for the general intent crime of possessing a firearm as a felon, as the evidence did not suggest that the defendant did not know that he was carrying a gun, but instead that he "had no choice but to carry the gun." 187 F.3d 639, 1999 WL 591440, at *7 (6th Cir. July 29, 1999) (unpublished table opinion).

In contrast to the proposed testimony in *Kimes* and *Gonyea*, Dr. Fabri's testimony does not suggest that Odeh felt compelled to commit a crime, but rather that Odeh did not know that

her answers on the naturalization application were false. The district court therefore should not have excluded Dr. Fabri's testimony based on the supposed categorical rule in *Kimes* and *Gonyea*. The Third Circuit has provided helpful insight into why cases like Odeh's arise infrequently. According to that court, "[m]ost states . . . limit psychiatric evidence to specific intent crimes on the theory that mental abnormality can virtually never disprove the mens rea required for general intent crimes." *Pohlot*, 827 F.2d at 897 n.4. In this case, however, Dr. Fabri's testimony potentially negates the general intent element of § 1425(a), Odeh's knowledge of the physical act of the offense. *Kimes* and *Gonyea* do not control.

The district court in this case, after initially concluding that § 1425(a) is a specific intent crime, conducted an evidentiary hearing on the testimony's admissibility. Aside from rejecting the categorical exclusion of Dr. Fabri's testimony under *Kimes* and *Gonyea*, we leave the evidentiary decision regarding the admissibility of the testimony to the district court in the first instance.

In addition to the argument based on *Kimes* and *Gonyea*, the Government makes three other arguments related to Dr. Fabri's testimony about why the district court's judgment should not be disturbed. None has merit.

First, the Government argues that even if the court should have admitted Dr. Fabri's testimony, Odeh did not preserve the argument that the testimony is admissible as to Odeh's knowledge of falsity. The Government asserts that Odeh sought to introduce the evidence only to negate her purpose, the potential specific intent element of § 1425(a). This argument fails. Odeh made an offer of proof concerning Dr. Fabri's testimony after the district court initially ruled that § 1425(a) is a specific intent crime. In that offer, Odeh

> respectfully request[ed] that the Court rule that the expert testimony of Dr. Mary Fabri is relevant to the defense of Ms. Odeh, and that Dr. Fabri be allowed to testify about her diagnosis of the defendant and how chronic PTSD would "typically" create a cognitive memory block to traumatic past experiences.

This offer does not state that Dr. Fabri's testimony is relevant only to Odeh's purpose. Even after the district court concluded that Dr. Fabri's testimony was inadmissible, Odeh argued that her own testimony about the effect of torture on her state of mind would be admissible

notwithstanding the court's conclusion that § 1425(a) is a general intent crime. This record shows that Odeh sought to introduce both her own testimony and Dr. Fabri's testimony to show how Odeh's alleged PTSD affected her knowledge of falsity. Plain error review does not apply.

Second, the Government argues that Odeh was not prejudiced by the exclusion of the testimony. An evidentiary ruling is prejudicial if the excluded evidence "creates a reasonable doubt that did not otherwise exist." *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 57 (2d Cir. 2001)) (internal quotation marks omitted). Because Dr. Fabri's testimony, if believed, negates an element of § 1425(a), and because the trial testimony of Odeh and Williams would not necessarily undermine Dr. Fabri's theory, we cannot uphold the district court's ruling on the basis that Odeh was not prejudiced.

In support of its no-prejudice theory, the Government argues that Dr. Fabri's testimony would have contradicted Odeh's trial testimony. The Government reasons that Dr. Fabri would have testified that Odeh subconsciously blocked her torture in Israel when reading questions on the naturalization application and hearing questions during the interview, while Odeh testified that she misunderstood the questions and consciously decided that they referred only to her time in the United States. In a pretrial evidentiary hearing, Dr. Fabri testified that Odeh's blocking of her memory would have been "automatic." Dr. Fabri also stated that Odeh's professed understanding of the questions is consistent with the symptoms of chronic PTSD. At trial, Odeh testified that if she had known that the questions referred to her time in Israel, she would have disclosed her criminal history in that country. Odeh also testified that her understanding of the questions was based in part on several questions in the application listed before the criminal history questions at issue in this case. Those questions were confined in scope to the United States. Odeh's trial testimony is not as inconsistent with Dr. Fabri's opinion as the Government argues, because Odeh's decision about what the questions were asking, under Dr. Fabri's theory, might have been shaped by the subconscious filtering of traumatic events in Israel. Odeh's testimony would not necessarily contradict Dr. Fabri's theory.

Odeh's immigrant visa application and Williams' testimony about the naturalization interview also do not prove that Odeh was not prejudiced. The Government suggests that Odeh knew that the statements on the naturalization application were false because she wrote the same

"No" answers on the immigrant visa application before even moving to the United States. Odeh testified, however, that her brother helped her fill out the application because her English was limited, and that she therefore did not know that the answers were false. The Government also notes that in Odeh's interview, Williams added "anywhere in the world" at the end of each criminal history question. Yet Odeh testified that she remembered clearly that Williams did not include this phrase. In sum, Odeh's trial testimony conflicts with the Government's reasons for why Odeh must have known that her answers were false. The omission of Dr. Fabri's testimony can thus not be independently supported by a determination on appeal that there was no prejudice.

The Government's third argument is that Dr. Fabri's testimony is subject to the restrictions of the Insanity Defense Reform Act (IDRA). This claim, too, is without merit. The IDRA provides that

> [i]t is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

18 U.S.C. § 17(a). Under the IDRA, to prove insanity—an affirmative defense that absolves a defendant of liability even if the defendant is factually guilty—a defendant must "show, by clear and convincing evidence, that he was 'unable to appreciate the nature and quality or the wrongfulness of his acts.'" *Kimes*, 246 F.3d at 806 (quoting § 17(a)). Notwithstanding the IDRA's restrictions on the use of mental defect evidence as a *defense*, evidence of a defendant's diminished mental capacity remains admissible to prove that the defendant could not form the required mens rea. *Id.*

The Government argues that Odeh's theory about why she did not know that her answers were false amounts to an insanity claim because Odeh was unable to appreciate the nature of her acts in answering the questions. However, in determining whether the IDRA's procedures apply, courts must look to the purpose for which a defendant offers evidence. *Id.* In *Kimes*, for instance, the expert's opinion that the defendant was unable to control his actions looked like the foundation for an insanity defense. *Id.* Yet because the defendant offered the evidence only to

negate his mens rea, not as an affirmative defense, we held that the IDRA did not exclude that evidence. *Id.* In this case, Odeh did not offer Dr. Fabri's testimony as a defense that might absolve her of criminal responsibility. Instead, Odeh sought to introduce the testimony to prove that she did not possess the required mental state. The IDRA's procedures therefore do not govern Odeh's claim.

**II.**

Odeh's remaining objections, which concern several evidentiary rulings and the reasonableness of her sentence, do not warrant relief.

**a. Admissibility of Israeli documents under the MLAT**

Odeh's argument that the district court erred in admitting several Israeli documents under the MLAT fails based on the terms of that treaty. The record indicates that the Government introduced at least eight documents produced by the Israeli government at trial. These exhibits are short documents and none contains details about the bombing except the three-page military indictment, Exhibit 3. Odeh argues that the district court should have first determined the truth or validity of the documents, and the legality or fairness of the system that produced them. The terms of the MLAT do not require or permit this type of inquiry.

The MLAT is not limited by its terms to records issued by civilian courts, because it covers "copies of any documents, records, or information which are in the possession of a government department or agency of th[e] State but which are not publicly available." MLAT, art. IX, ¶ 2. Because the Israeli Defense Forces is "a government department or agency," Odeh's claim that the MLAT does not cover Israeli military documents is unavailing. Nor is it the district court's duty to inquire into the fairness of the system that produced documents admitted under the MLAT. The argument that the documents are inadmissible because they were produced by an allegedly illegal occupation would read a requirement into the MLAT that documents are admissible only if there is no dispute about the legitimacy of the foreign government's actions. The MLAT explicitly states, however, that once a document is properly authenticated pursuant to another treaty or by an appropriate foreign official, "[n]o further authentication or certification shall be necessary in order for such records to be admissible in

evidence in proceedings of the Requesting State." *Id.* This directive permits no inquiry into the fairness or legitimacy of the system producing the documents.

Finally, whether Odeh was tried and convicted in Israel consistent with the American understanding of due process is not relevant to this § 1425(a) prosecution. The decisions cited by Odeh discussing due process and the treaty-making power therefore have no bearing on this case. The district court repeatedly emphasized this point by noting that the jury was tasked with deciding only whether the elements of § 1425(a) had been met. None of these elements required the jury to pass on the fairness of Odeh's Israeli conviction.

### b. Rule 403 objections to the Israeli documents

Odeh next makes two arguments concerning the Israeli documents—and particularly Exhibit 3, the indictment—that appear to be based on Rule 403 of the Federal Rules of Evidence. That rule prohibits, among other things, the admission of relevant evidence if its "probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Odeh urges that the district court erred in (1) refusing to order the Government to stipulate that Odeh was convicted of "serious offenses" and served ten years in prison, and (2) refusing to redact Exhibit 3 to omit language that Odeh characterizes as unfairly prejudicial. We review the district court's rulings on these issues for abuse of discretion. *See United States v. Henley*, 360 F.3d 509, 518 (6th Cir. 2004) (citation omitted). Neither argument requires reversal.

The Government was not required to stipulate to the fact of Odeh's conviction and sentence, because the Government may generally prove the elements of a crime with any admissible evidence and the limited exception to this rule does not apply here. The general rule is that a "defendant has no right to selectively stipulate to particular elements of the offense." *United States v. Boyd*, 640 F.3d 657, 668 (6th Cir. 2011) (quoting *United States v. Hebeka*, 25 F.3d 287, 291 (6th Cir. 1994)) (internal quotation marks omitted). In *Old Chief v. United States*, the Supreme Court announced what we have described as a "narrow limitation" to this rule, *see id.*, holding that the Government cannot refuse a defendant's offer to stipulate to his felon status in prosecutions under the federal felon-in-possession statute. *Old Chief v. United States*, 519 U.S. 172, 191–92 (1997). The Court explicitly confined its holding "to cases

involving proof of felon status." *Id.* at 183 n.7. Because this case does not involve a prosecution under the felon-in-possession statute, the *Old Chief* exception does not apply.

The second Rule 403 argument challenges the district court's refusal to redact two phrases in Exhibit 3. Those phrases state that Odeh was charged with "plac[ing] explosives in the hall of the SuperSol in Jerusalem . . . with the intention of causing death or injury" and that "[o]ne of the bombs exploded and caused the death of Leon Kannar and Edward Jaffe, May Their Memory Be a Blessing, as well as injuries to a multitude of people." Rule 403 protects against "evidence which tends to suggest decision on an improper basis." *United States v. Schrock*, 855 F.2d 327, 335 (6th Cir. 1988) (quoting *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986)) (internal quotation marks omitted).

The district court was not required to redact the first phrase, as the phrase had highly probative value for the Government's case—value that the district court noted was "overwhelming." Without this information, the Government might not have been able to prove materiality and procurement. The district court explained that "a conviction for participating in a bombing that resulted in the death of two civilians would be material because it would be relevant to Defendant's good moral character. An arrest for minor offenses such as jay-walking or loitering would not satisfy the materiality requirement." The district court also reasoned that the information in Exhibit 3 was strong evidence of procurement contrary to law, because the fact that Odeh placed a bomb with the intent to kill civilians triggered a statutory bar to admission to the United States. *See* 8 U.S.C. § 1182(a)(3)(B)(i)(I) (excluding from entry any alien who "has engaged in a terrorist activity"); § 1182(a)(3)(B)(iii)(V)(b) (defining terrorist activity to include the use of an explosive "with intent to endanger . . . the safety of one or more individuals"). No good reason requires disturbing the district court's analysis.

The names of the victims and the Jewish saying "May Their Memory Be a Blessing" also did not require redaction.[5] In this case, the six-word blessing was not inflammatory or unduly prejudicial. Indeed, the blessing added no information beyond that which was already contained in the statements that Odeh was charged with placing a bomb in the SuperSol with the intent to

---

[5]Neither Judge Batchelder nor Judge Moore joins in this paragraph or the next. These two paragraphs thus represent only the opinion of Judge Rogers and not the opinion of the court.

kill, and that two people died.  Moreover, the district court gave a limiting instruction that Odeh was not on trial for the events in Israel and that the information in the Israeli documents was relevant only to whether Odeh unlawfully procured naturalization.  Such a limiting instruction is presumed to have reduced the risk of impermissible inferences.  *United States v. Feagan*, 472 F. App'x 382, 390 (6th Cir. 2012) (citing *United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996)).

To say that members of this court might have redacted the names of the victims and the Jewish blessing is far different from saying that the district court's conclusion to the contrary was an abuse of discretion.  Exhibit 3 and the other documents had strong probative value.  These documents would not so inflame a jury that it could not properly exercise its function.  The district court did not abuse its discretion in admitting the Israeli documents.

## III.

Lastly, Odeh's eighteen-month sentence is not procedurally or substantively unreasonable.  Odeh maintains that the district court should have further considered her history and characteristics—including her age of sixty-seven at sentencing, PTSD, social work, and alleged torture—and that she would be deported as a result of her conviction.  Sentencing decisions are reviewed for abuse of discretion.  *United States v. Wright*, 747 F.3d 399, 413 (6th Cir. 2014).  The district court did not abuse its discretion in imposing a sentence in the middle of the advisory Guidelines range of fifteen to twenty-one months.

As an initial matter, no procedural defects affected Odeh's sentence.  A court commits procedural error if it "fail[s] to calculate (or improperly calculat[es]) the Guidelines range, treat[s] the Guidelines as mandatory, fail[s] to consider the [18 U.S.C.] § 3553(a) factors, select[s] a sentence based on clearly erroneous facts, or fail[s] to adequately explain the chosen sentence."  *Gall v. United States*, 552 U.S. 38, 51 (2007).  The district court took none of these missteps.  The district court also did not commit procedural error by failing to state explicitly why it would not reduce Odeh's sentence based on her age or PTSD.  In *United States v. Gunter*, we held that a sentencing court need not, in a "point-by-point" fashion, respond to each mitigation argument offered by a defendant.  620 F.3d 642, 646–47 (6th Cir. 2010).  Instead, a

reviewing court must only be satisfied that the sentencing "court . . . conduct[ed] a meaningful sentencing hearing and truly consider[ed] the defendant's arguments." *Id.* at 646 (citing *United States v. Wilson*, 614 F.3d 219, 226–27 (6th Cir. 2010) (Martin, J., concurring)). The sentencing hearing in this case meets this requirement.

Nor is Odeh's sentence substantively unreasonable on the basis that the district court did not accord sufficient weight to Odeh's age, PTSD, social work, and torture. Our review for substantive reasonableness involves a "totality of the circumstances [analysis]." *Gall*, 552 U.S. at 51. A presumption of reasonableness attaches to sentences, like Odeh's eighteen-month sentence, that are within the Guidelines range. *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc). Odeh cannot rebut this presumption, because the district court thoroughly considered Odeh's history and characteristics in imposing the sentence. The court noted that although Odeh's history "include[s] some terrorist[] activities," she had "been involved in doing a lot of good work[] in helping Arab immigrant women in the Chicago area" in the recent past and had been "reformed." The court further acknowledged that it had received letters from people across the United States on Odeh's behalf, and the court commended Odeh for her social work. Notwithstanding Odeh's social work and reputation, however, the court noted that "Odeh lied under oath to get an immigration visa and to become a U.S. Citizen," and found that she perjured herself on the stand and refused to follow the court's instructions about off-limits topics. Finally, the court stated that although the case had been politicized by Odeh, the Israeli-Palestinian conflict was irrelevant because the case was about Odeh unlawfully procuring citizenship. In sum, the court properly considered Odeh's history, social work, and other relevant characteristics, as well as the remaining § 3553(a) factors.

Odeh's last argument is that the district court should have taken into account the fact that her citizenship would be revoked. No court, however, has *required* a sentencing court to consider the possibility of a defendant's deportation at sentencing. In fact, some courts have held that doing so is categorically impermissible. *See United States v. Chin Chong*, No. 13–CR–570, 2014 WL 4773978, at *3 (E.D.N.Y. Sept. 24, 2014) (recognizing split of authority). We have previously held that some consequences of a conviction—such as legal fees, the loss of a professional license, or the fact of a felony conviction—are impermissible factors for courts to

consider. *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014). Although we have not yet addressed whether deportation is a permissible factor, this question need not be decided in this case; even if Odeh's deportation is a permissible factor, the sentence was reasonable. As explained earlier in this opinion, Odeh's middle-of-the-range sentence was based on the district court's thorough review of the statutory factors. In *United States v. Samayoa-Baltazar*, an unpublished decision, we held that the district court did not abuse its discretion by failing to explicitly address deportation at sentencing, because the district court properly weighed the § 3553(a) factors. 436 F. App'x 620, 626 (6th Cir. 2011). Moreover, limiting punishment to deportation would be unacceptable, according to the district court in this case, because this "would not serve any kind of deterrence." The sentencing hearing was procedurally and substantively reasonable.

## IV.

Our reversal is based on the categorical exclusion of PTSD-related evidence because § 1425(a) was deemed to be a general-intent crime. We do not address other possible bases for excluding the evidence, under evidentiary standards such as those identified by the district court in its order discussing the use of PTSD testimony in federal and state courts. Nor do we prescribe whether a new trial would be required once the evidentiary determination has been made.

The judgment of the district court is vacated, and the case is remanded for proceedings consistent with this opinion.

---

**CONCURRING IN PART AND IN THE JUDGMENT IN PART**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and concurring in the judgment in part. I concur in the opinion, but I would hold that, although harmless error, the district court's decision to admit certain aspects of the military tribunal indictment was an abuse of discretion.

Federal Rule of Evidence 403 states that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Unfair prejudice results from evidence which tends "to suggest decision on an improper basis, [such as] an emotional one." *United States v. Whittington*, 455 F.3d 736, 739 (6th Cir. 2006) (internal quotation marks omitted).

The military tribunal indictment states that Odeh "placed explosives in the hall of the SuperSol in Jerusalem[] with the intention of causing death or injury." R. 186-6 (Military Tribunal Indictment) (Page ID #2632). It then states that "[o]ne of the bombs exploded and caused the death of Leon Kannar and Edward Jaffee, May Their Memory Be a Blessing, as well as injuries to a multitude of people." *Id.* The first statement—describing Odeh's actions and intent—does not require redaction. It has considerable probative value and there is little risk of unfair prejudice. The second statement does require redaction. The victims' names and the prayer have no probative value—they are wholly unnecessary. What is more, the danger of unfair prejudice is significant. The names and the prayer give color and texture to the bombing, so that it becomes both more real and more difficult to separate from the instant offense. They provide exactly the kind of detail likely to provoke a visceral reaction. This is too much for a limiting instruction to overcome. An admissible statement would be that "[o]ne of the bombs exploded and caused the death of [two people], as well as injuries to a multitude of people." *Id.*

Although I think this error of admitting into evidence the two names and the prayer rises to the level of an abuse of discretion, I recognize that it is harmless error: given the limited arguments presented to the jury, it was not "more probable than not that the error materially

affected the verdict." *United States v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008) (internal quotation marks omitted); *see also United States v. Mackey*, 265 F.3d 457, 463 (6th Cir. 2001). Therefore, on this issue I concur only in the judgment.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part. Today's decision, well-reasoned as much of it is, fails to adequately address one of Odeh's central arguments, namely, whether she was prevented from presenting a complete defense at trial. The majority gives facially plausible reasons for the government's being permitted to introduce at trial evidence that Odeh engaged in terrorism even though she was prohibited from testifying about her claims of torture. But it is able to reach this conclusion only by tacitly adopting the district court's heads-I-win-tails-you-lose application of § 1425(a) to Odeh. That court's inconsistent application of the statute crippled Odeh's defense at trial. Thus, while I agree with Parts I and III of the majority's opinion and with much of the reasoning of Part II, I nevertheless respectfully dissent in part.

### I.

From the proceedings in the district court, one might believe that there are two versions of § 1425(a) involved in this case. When the district court considered the admissibility of Odeh's testimony regarding torture—testimony it found credible—it spoke of § 1425(a) as dealing solely with whether Odeh acted "contrary to law" by lying under oath in obtaining U.S. citizenship. But when it considered the admissibility of the government's evidence—such as the Israeli indictment—it mentioned an additional element, which it defined at trial as whether "it is reasonably likely that the United States Citizen and Immigration Services would have found [Odeh] ineligible for naturalization and denied her application if it had known the truth about [her] past."

This inconsistency is significant. If this case is just about lying under oath, then I agree with the majority that there are no due process issues in admitting the Israeli court documents. Under this approach, Odeh's Israeli criminal record would not be admitted to show that she in fact did any of the things of which she was convicted, but only that she lied about her past.

Similarly, whether she was tortured would (apart from the possible effects of PTSD) be irrelevant to whether she lied.

But if this case is only about lying under oath, then I cannot see how allowing *any* of the objected-to portions of the Israeli indictment to go before the jury was not an abuse of discretion under Rule 403. As Judge Moore points out, the names of the victims and the prayer have almost no probative value and present a serious danger of unfair prejudice. Likewise, proving that Odeh lied under oath, and even that that lie was "material," would not require evidence that she was charged with "plac[ing] explosives in the hall of the SuperSol in Jerusalem . . . with the intention of causing death or injury." The risk of unfair prejudice from this evidence was enormous, especially since Odeh was not permitted to testify at trial about her claims of torture. The word "terrorist" may never have been uttered before the jury, but it was doubtless in the minds of everyone present.

The indictment was, of course, probative with respect to what the immigration authorities would have done had they known the truth about Odeh's past. But the district court's conclusion that her testimony about being tortured was inadmissible seems to me to be defensible only if one ignores the what-would-immigration-authorities-have-done element. Indeed, the government appears to have admitted as much in one of its motions *in limine*:

> While evidence of the circumstances and process relating to a conviction would have been relevant to United States Citizenship and Immigration Services had defendant disclosed her criminal record in her naturalization application (as she was obligated by law to do), it has no relevance to this case. Rather, this case focuses on the truthfulness of her answers in the immigration process, not the level of due process afforded her in Israel.

R. 66 at PageID # 593.[1] The majority's summary conclusion that Odeh's constitutional arguments have "no bearing" on the admissibility of the Israeli documents under the MLAT because "the jury was tasked with deciding only whether the elements of § 1425(a) had been

---

[1]It bears mentioning that some of our sister circuits have held that the validity of "a criminal conviction duly obtained under the laws of a foreign country" may not be challenged in an immigration proceeding. *Chiaramonte v. Immigration & Naturalization Serv.*, 626 F.2d 1093, 1098 (2d Cir. 1980). But, as the word "duly" suggests, this rule is not so iron-clad that courts have brooked no exceptions. For example, the Seventh Circuit has held that this rule does not apply when "the proceeding that resulted in the conviction was demonstrably, and it is fair to say admittedly, a travesty—a parody—of justice." *Doe v. Gonzales*, 484 F.3d 445, 451 (7th Cir. 2007).

met" is likewise inadequate. Maj. Op. *supra* at 14. That evidence was used not only to prove that Odeh in fact had been arrested, charged, convicted, and imprisoned, but also that she was not a person of good moral character.

The Fourth Amendment exclusionary rule applies to foreign searches and seizures if the defendant can show that "the conduct of foreign police shocks the judicial conscience." *United States v. Valdivia*, 680 F.3d 33, 51 (1st Cir. 2012). And "[it] is well settled that the Bill of Rights limits both the federal government's treaty-making powers as well as actions taken by federal officials pursuant to the federal government's treaties." *Sahagian v. United States*, 864 F.2d 509, 513 (7th Cir. 1988). The evidentiary concerns may be different in this circumstance, however, because the jury was instructed to step into the shoes of the immigration authorities. If Odeh had told the truth, those officials would doubtless have looked at this evidence. By the same token, however, they would have also considered Odeh's claims of torture.

Thus, the majority opinion fails to address a glaring tension in this case, namely, how the jury could fairly determine whether Odeh's past rendered her inadmissible without ever hearing what she would have told the immigration authorities about the story behind her criminal record. The upshot of all this is that Odeh is left somehow holding two short ends of the same stick.

## II.

In fairness to the majority, the inconsistency in the district court's approach is not challenged on appeal. But it should be evident by this point that the arguments that *are* before us cannot be adequately confronted without first deciding whether the government must prove that Odeh's naturalization application likely would have been denied if the immigration authorities had known the truth about her past. Fortunately, this is not a difficult question. Section 1425 is a two-part statute. *Compare* 18 U.S.C. § 1425(a) *with* 18 U.S.C. § 1425(b). And we have held that these two parts provide distinct "means by which unlawful naturalization can be obtained. Under the statute one can procure naturalization 'contrary to law' (§ 1425(a)) or naturalization to which one is not entitled (§ 1425(b))." *United States v. Damrah*, 412 F.3d 618, 622 (6th Cir. 2005). Odeh was charged only under § 1425(a), and reading that provision to incorporate immigration laws such as 8 U.S.C. § 1182(a)(2)–(3), which govern eligibility to receive

immigration benefits, would eliminate the distinction between § 1425(a) and (b), violating "one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation marks and brackets omitted). *But see United States v. Latchin*, 554 F.3d 709, 712–13 (7th Cir. 2009) (holding that a conviction under § 1425(a) can stand only if the defendant "procured" naturalization, that is, whether "it is fair to infer that the [defendant] was actually ineligible" (quoting *Kungys v. United States*, 485 U.S. 759, 784 (1988) (Brennan, J., concurring) (internal quotation marks omitted)).[2]

## III.

Whether a defendant's naturalization application would have been denied if the immigration authorities had known the truth about her past is not an element of § 1425(a). In light of this, I would have held that the district court abused its discretion in allowing the objected-to portions of the Israeli indictment to go before the jury and that this error was not harmless. This case should be remanded for a new trial. From the majority's decision to the contrary, I respectfully dissent.

---

[2]The *Latchin* court reached this conclusion by looking to the Supreme Court's understanding of "procurement" as used in 8 U.S.C. § 1451(a), the civil denaturalization statute. *United States v. Latchin*, 554 F.3d 709, 713 (7th Cir. 2009) (citing *Kungys v. United States*, 485 U.S. 759). Significantly, § 1451 does not have the two-part structure of 18 U.S.C. § 1425, and *Kungys* is thus inapposite.